[Civ. No. 319. Fourth Appellate District.—March 6, 1931.]

W. E. LAWSON, Respondent, v. LOUIS RUSCONI et al., Appellants.

Everts, Ewing, Wild & Everts and C. M. Ozias for Appellants.

Calkins, Hagar, Hall & Linforth and Ray W. Hays for Respondent.

BARNARD, P. J.—The defendants were in the business of purchasing fresh grapes in the San Joaquin Valley and shipping the same to and selling them in various eastern markets. It is an admitted fact that shippers of such grapes frequently suffered loss and damage by reason of decay and mold of the grapes, when shipped in ordinary refrigerator-cars. In September, 1927, the defendants entered into two contracts with the plaintiff, each of which contracts recited that the plaintiff was the owner and entitled to the exclusive use in California of a certain device or apparatus known as an Esofumer, being a device for the diffusion of sulphur dioxide gas. Under these contracts, the plaintiff leased to defendants and the defendants hired from the plaintiff two of these machines, with the right to

use the same for a period of three months, the defendants paying a deposit of $100 on each machine, which deposit was to be returned when the machines were redelivered. The defendants further agreed to pay to the plaintiff $10 for each car of grapes treated by the use of said Esofumer, the plaintiff agreeing to furnish the necessary gas. It is conceded that these machines were to be used to diffuse gas through cars of grapes after they were loaded, and that the purpose of such gasing process was to prevent mold and decay of the grapes while in transit. The only contest here is as to the degree of perfection required of the process. During the fall of 1927, defendants shipped 307 cars of grapes, of which 174 cars were treated with this process and 133 were not. This action was brought to collect the stipulated price for the cars treated, at $10 per car. In their answer, the defendants set up the defense that many of the cars arrived in eastern markets with the grapes in a moldy and decayed condition. From a judgment in favor of the plaintiff, the defendants have appealed.

The various points made by appellants may be summarized as a contention that the evidence is not sufficient to support various findings of the trial court to the effect that the plaintiff had fully performed his contracts, for the reason that the trial court overlooked and ignored the warranty implied by law, which was to the effect that the grapes would arrive at market free from decay and mold; and that since the evidence shows that some of the grapes arrived in a moldy condition, the contracts were not complied with by the plaintiff. Appellants contend that section 1770 of the Civil Code applies to these contracts, and that there was therefore an implied warranty that the use of this apparatus and process would result in accomplishing the particular purpose for which it was used. Under the statute referred to, such an implied warranty would only be that it was reasonably fit for such purpose. Appellants, however, take the position that the purpose to be here accomplished was a total prevention of all decay and mold of the grapes. They rely upon the following testimony of Edna Rusconi, one of the appellants: "Mr. Rusconi asked Mr. Babcock, and I may have asked questions too but I don't remember, to tell him what the Esofumer would do and the gassing process and it was—there was considerable

general talk about the condition of grapes and Mr. Babcock told Mr. Rusconi that persons using this process should get their grapes to the eastern markets in better condition than persons not using it; that it would prevent, particularly as I remember it, mold from coming onto the grapes and rot while they stayed on track before they were sold, and Mr. Rusconi agreed with him that it was a very good thing provided it would do that and Mr. Babcock assured him that it would do that and on the strength of that Mr. Rusconi told him he would take it, and left me to complete details as he had an appointment and had to leave.''

Appellants do not claim that this was an express warranty, as evidence of the same would have been inadmissible under the circumstances, but they argue that, properly interpreted, her testimony was · that appellants were told that this process would prevent rot and mold, and that where it was used, grapes would arrive at market free from such mold or decay. And it is argued that this evidence discloses the nature and terms of the warranty that is implied by law. Without considering such questions as the admissibility of this evidence, or the fact that, if interpreted as contended for by appellants, it would amount to an express contract, the court was not compelled to draw the inference contended for, but could properly interpret the language used as a representation that a person using this process would get his grapes to market in better condition than a person not using it, which, at most, would merely corroborate any warranty that could be implied by law, namely, that the process was reasonably fit for the purpose intended.

It is doubtful whether any such warranty may be implied by law in this case, there being no evidence to show that either the device or the gas was manufactured by the plaintiff, the contract being a lease and not a sale, and the contract providing that the defendants acknowledge receipt of the machine in good order, and ''accepts the same as such without any express or implied warranty of any kind or nature whatsoever''. However, we feel it is not necessary to decide that question.

Assuming an implied warranty, as contended for, it would be to the effect that the device was reasonably fit for the purpose intended. The court found that the contracts

were fully complied with by the respondent, and even if an implied warranty be assumed, we think this finding is supported by the evidence. Such a warranty would not call for one hundred per cent efficiency upon the part of the machine and process, but only for such results as would be reasonable under the circumstances. While certain machinery for certain purposes may closely approximate perfection in its operation, many kinds of machinery and processes are extremely valuable and constitute a great improvement over prior methods of doing certain things, although from the very nature of the case, perfect results are impossible. In such cases, reasonable fitness for the purpose intended is to be judged by a comparative standard, rather than by an arbitrary one. This is particularly true with reference to a method of handling fresh grapes, and attempting to get them to market in good condition. Such fruit is perishable at best; it is of varying degrees of ripeness when picked; it varies in size, soundness, condition and quality; it must be handled several times; it may be much or little injured by less or greater care in handling; it is extremely sensitive to such conditions as temperature and moisture; and many other things, particularly time, play a most important part in affecting its condition at its destination. In reference to an appliance and process designed to attempt to get such a product, in good condition, to a market several thousand miles away, no warranty that all fruit shipped will arrive in a perfect or practically perfect condition can be implied by law. If any warranty can here be implied, it was only that this process was reasonably fit for the purpose intended, and whether or not it was so fit was a question of fact for the trial court.

Accepting appellants' own evidence, it appears that five out of every seven cars that were treated with this process arrived in New York entirely free from mold, while only one out of every two of the cars not so treated arrived free from mold. It further appears that some of the cars that did show mold only showed it slightly. Appellants take the position that any mold at all is a violation of the implied warranty. Their agent, who received the grapes in New York, testified that he did not examine an entire car, but if mold showed up at all he did not pay any attention to the other boxes. As was said by the court in *Nye &*

*Nisson* v. *Weed Lumber Co.*, 92 Cal. App. 598 [268 Pac. 659, 663]: "It cannot reasonably be said that there is a breach of warranty as to the quality of processed eggs, merely because a case may contain a defective egg or two." The evidence further shows that at least eight of the cars were delayed in starting for three days because of car shortage, and that mold is much more apt to occur after a delay of twenty-four hours. While the condition of the grapes when packed is most important, the evidence upon that point is not too satisfactory. Louis Rusconi, one of the appellants, testified that he didn't see any mold before they were shipped. When asked if he had made an examination of them, he replied, "I am watching them pretty close." Since the grapes were being shipped from two separate points, the court may well have considered the answer somewhat evasive. While apparently stressing the fact of his careful handling of the grapes, he testified that most of them were hauled on wagons equipped with springs. The inference is that those not so handled may not have been in as good condition. All of the circumstances considered, and bearing in mind the only warranty which could be implied by law, even if an implied warranty be assumed, the findings of the court that the contracts were complied with by the respondent are fully sustained by the evidence.

The judgment is affirmed.

Marks, J., and Jennings, J., concurred.