[No. 30268.   Department Two.   November 17, 1947.]

ALBERT H. LENT, *Respondent*, v. EARL T. McINTOSH *et al.*, *Appellants.*[1]

*Brooks K. Johnson* and *Charles W. Johnson*, for appellants.

*John H. Caley* and *John F. Walthew*, for respondent.

JEFFERS, J.—This is an appeal by defendants Earl T. McIntosh and wife from a judgment entered on February 25, 1947, in favor of plaintiff, Albert H. Lent.  In this opinion, Earl T. McIntosh will be referred to as the sole defendant.

[1]Reported in 186 P. (2d) 626.

The questions raised on the appeal pertain to certain claimed representations made by defendant to plaintiff, relative to a tractor with a bulldozer attachment which McIntosh sold Lent under a conditional sale contract. The gist of the complaint is that on January 8, 1946, defendant represented to plaintiff that he was the owner of a diesel caterpillar tractor, model RD-8, with bulldozer and accessories; that the same was in good merchantable and operating condition and free from defects; that plaintiff, believing such representations and relying thereon, purchased the tractor for the sum of six thousand dollars, of which sum plaintiff paid two thousand in cash. It is further alleged that the sale contract was in writing, a copy of which was referred to in, and attached to, the complaint.

It is next alleged that plaintiff forthwith took possession of the tractor and attempted to operate same, but that the tractor was not in good operating condition, immediately broke down, and became out of order and not capable of being operated; that plaintiff has been compelled to expend a considerable sum in cash for repairs thereon, and will be compelled to expend a considerable sum in the future, in the total amount, as plaintiff believes, of approximately seventeen hundred dollars.

A second cause of action alleges a violation of the maximum price regulation of the office of price administration. However, on this appeal we are not concerned with the second cause of action.

Defendant entered a general denial to the complaint and, by way of cross-complaint, asked for judgment on a five-hundred-dollar note given by plaintiff to defendant as a part of the down payment on the tractor.

The matter came on for trial before the court on September 5, 1946, and, after the close of the case, and on November 14, 1946, the court made and entered its memorandum decision, as follows:

"In my opinion, the evidence does not bring the transaction surrounding the purchase and sale of the tractor and bulldozer within the jurisdiction of the Office of Price Administration, but will find that defendant McIntosh rep-

resented to the plaintiff, at the time of the purchase of said tractor, that said tractor was in good condition, and that the plaintiff relied on said representation except as to those defects that were plainly apparent, such as the track, etc., and can offset against said note the reasonable cost of repairing such defects."

Counsel who represented plaintiff at the trial died sometime after the trial was completed.

On January 28, 1947, counsel for defendant filed a motion to clarify the above memorandum decision, and on the same day, a motion for new trial.

Findings of fact, conclusions of law, and judgment were presented by present counsel for plaintiff on February 25, 1947, and were signed and filed by the court on that date.

Finding No. 3 states:

"That on, to-wit, the 8th day of January, 1946, the defendant represented to the plaintiff that he was the owner of that certain Caterpillar Diesel Tractor, No. 1-H527, Model No. 8, 6 cylinders, Motor No. 23348, with bulldozer and necessary accessories, that the same was in a good merchantable and operating condition and free from defects, and that the plaintiff, believing the said representations and relying thereon, purchased the said caterpillar tractor for the sum of Six Thousand ($6,000.00) Dollars of which sum the plaintiff paid the sum of Two Thousand ($2,000.00) Dollars in cash and which contracted sale was in writing, a copy of which was attached to the complaint, marked exhibit 'A' and made a part thereof as if fully set forth therein."

Finding No. 4 states:

"That the defendant, prior to the purchase of said tractor, did state and represent to the plaintiff as follows:

"1. That the machine was then and there in operating condition and that certain cracks in the drive case on said tractor were surface scratches only and did not, in any manner, affect the operating efficiency of said tractor.

"2. That said statements and representations, as set forth in the preceding paragraph, were false and untrue and were known by the defendant to be false and untrue in that there were one or more cracks in the cylinder and cylinder walls of said tractor and that the cooling system on said tractor was filled with diesel oil instead of water and that the cracks

in the drive case extended completely through said drive case.

"3. That, by reason of the cooling system being filled with diesel oil rather than water, the cracks in the cylinder walls were not and could not be discovered by the plaintiff upon reasonable inspection prior to said purchase. That the plaintiff operated said tractor proximately sixty hours before the discovery of the presence of said diesel oil in the cooling system and, by reason thereof, the pump became wholly out of commission and the diesel motor broke down and became wholly out of commission."

Finding No. 5 states:

"That, by reason of the representations made by the defendant to the plaintiff as heretofore stated, the plaintiff was compelled to expend the sum of $678.25 as and for motor parts; the sum of $450.00 as and for a drive case and the sum of $310.19 as and for a pump and was further compelled to expend the sum of $352.00 as and for labor to remove the damaged parts and install the above stated new parts."

Finding No. 7 states:

"That, by reason of the misrepresentations of the defendant, the plaintiff has been damaged in the sum of $1,790.44."

The court concluded:

"1. That the plaintiff is entitled to damages on account of the misrepresentations of the defendant in the sum of $1,790.44.

"2. That the complaint in this action having prayed for damages in the sum of $1700.00 and said complaint not having been amended, the plaintiff is entitled to damages only in the sum of $1700.00, together with his costs and disbursements here to be taxed.

"3. That the defendant is entitled to an offset against the said sum of $1700.00 by promissory note executed and delivered to him by the plaintiff in the sum of $500.00. That said note may be applied by the defendant in payment of the sum of $500.00 of said judgment."

Judgment was entered in accordance with the conclusions of law.

Defendant has appealed from the judgment entered and

assigns error on the making and entering of finding No. 3, specifically that portion of such finding which states that appellant represented to respondent that the tractor was in good merchantable and operating condition and free from defects; in making and entering findings of fact Nos. 4 and 5; in making and entering conclusion of law No. 1; in refusing to grant appellants' motion for new trial; and in entering judgment in favor of respondent.

Appellant contends that the complaint is based upon a breach of warranty, and that this was the theory upon which the case was tried. There is support for that contention in the record. After the close of the case, the court requested counsel to file briefs. The brief of counsel for respondent is in the record, and in this brief counsel refers to and quotes from Rem. Rev. Stat., §§ 5836-12 and 5836-15 [P.P.C. § 860-3, -9]. The first section referred to defines express warranty, and the second section states when there is no implied warranty. Following these citations, counsel for respondent state in their trial brief:

"We believe that we have fully proven our first cause of action and that we should be allowed judgment for $————— and our costs."

We think it apparent, however, that the judgment which was entered was based upon the theory of fraud and deceit, that is, that appellant made false representations to respondent for the purpose of inducing him to purchase the tractor.

In his brief on this appeal, respondent states:

"As heretofore stated, the recovery allowed by the trial court was specifically limited to items of damage arising from two specific representations which the court found to be untrue and relied upon by the respondent; namely, (1) badly cracked cylinder walls, the existence of which was concealed by the presence of oil in the cooling system, and (2) cracks in the chassis case which, contrary to fact, were represented by the appellant to be only surface scratches."

Let us assume first, then, that this case was tried and judgment entered upon the theory of fraud.

We stated in *Webster v. Romano Engineering Corp.*, 178 Wash. 118, 34 P. (2d) 428:

"We have, however, along with all other courts, recognized certain essential elements that enter into its [fraud] composition. These are: (1) A representation of an existing fact; (2) its materiality; (3) its falsity; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person to whom it is made; (6) ignorance of its falsity on the part of the person to whom it is made; (7) the latter's reliance on the truth of the representation; (8) his right to rely upon it; (9) his consequent damage."

It is undisputed that at the time of this sale, appellant owned the tractor and bulldozer attachment. He had purchased it from Western Tractor & Equipment Company in July of 1945. The sale was made through Carl Akin, acting as the agent of the tractor company, and the price paid by McIntosh was forty-eight hundred dollars. We think there is no question but that appellant bought the tractor "as is." Appellant, either personally or through his employees, operated the machine at various times, in all about four hundred hours, up to Thanksgiving of 1945, when he decided that he did not want to continue such operations. Appellant stated that weather conditions were bad, that he had been trying to operate in the mud, and that he was not making any money with the machine. He had procured and had put on a new bulldozer attachment at a cost of fourteen hundred dollars, and he had expended in other repairs about one thousand dollars. Sometime after Thanksgiving Day of 1945, appellant pulled the tractor onto the used car lot operated by Carl Akin. This lot was apparently along the Pacific highway, between Fort Lewis and Tacoma.

Sometime prior to the time McIntosh took the tractor to Akin's lot, he had put oil in the cooling system, for the purpose, as he stated, of keeping it from freezing. The tractor, with the attachment and the accessories, was left with Akin to sell at an agreed price of six thousand dollars. While apparently Akin and McIntosh had some conversation about what should be asked for this equipment, there is no

testimony that McIntosh ever made any representation to Akin as to the condition of the tractor, and there is no testimony indicating that Akin ever made any false representations to respondent regarding the condition of the tractor. There is no testimony that appellant ever had occasion to, or did, tear down the motor, which all the testimony shows would be necessary to determine that there were cracks in the cylinder walls; nor is there any testimony indicating that appellant ever took the transmission apart, which the testimony shows would be necessary to determine that any cracks which might appear on the outside of the transmission case went clear through the case. Appellant stated that he had never gone inside the engine.

This equipment was used chiefly in clearing land of trees and stumps. Respondent was desirous of buying such an outfit, and he and his partner, Gus Peterson, had been looking around in the surplus lots for a tractor equipped as this one was. Lent and Peterson had been to Fort Lewis, and as they came back by the Akin lot they saw this tractor, went in and looked at it. This was about January 4, 1946. We quote from the testimony of Mr. Peterson, who had been asked what happened, what was said and done when respondent called on Mr. McIntosh on January 4th:

"A. January 4th we went over to look for some tractors while we was driving up the road, and I went by before in December and I seen this cat sitting alongside of the road, so we went back to look at it. We looked at it, and on the 7th we went back to get it. Q. What, if any, conversation took place in regard to the caterpillar? THE COURT? 7th of what? THE WITNESS: Of January this year. Q. What was said and done regarding the condition of the caterpillar, if anything? A. Well, I asked Mr. McIntosh what kind of shape the motor was in, and he said it would need rings in sixty days. And also the tracks. And he said the tracks would run approximately six months, but the motor—we took it over— Q. (Interposing) That the end of the conversation? A. Well, he said the tractor was supposed to be in good shape."

It should be stated here that Mr. Peterson was a caterpillar operator of some twenty years experience, and also had experience as a mechanic.

Sometime after Mr. Peterson started to use the caterpillar, he drained the oil out of the cooling system and put in water. Mr. Peterson was asked why the diesel oil was put in the radiator, if he knew.

"No, I don't. The only reason I can give was maybe it was put in there for winter use."

It was when he put in the water that Mr. Peterson discovered the cylinder head leaked.

Mr. Peterson, on cross-examination, admitted they asked for no guarantee of any kind, and that, so far as he knew, the whole agreement was embodied in the written contract.

It should also be stated here that, while Mr. Peterson's name does not appear on the contract or note to which reference has been made, nor is he mentioned as a party plaintiff, it is admitted that he was in fact a partner of Mr. Lent in this venture.

Mr. Akin stated that the first time they looked at the tractor they talked to him; that he told them the price was six thousand dollars. They asked Mr. Akin about the condition of the machine, and he said he thought it was in fair condition.

While some of the testimony is not too definite as to dates, it appears that on the 7th or 8th of January, when respondent and Mr. Peterson came to get the machine, Mr. Akin sent for Mr. McIntosh. This was the first time either respondent or Mr. Peterson had talked to appellant. At that time, respondent asked Mr. McIntosh about the oil in the cooling system and was told it had been put in to keep the cooling system from freezing. Mr. McIntosh further told him he thought the caterpillar would have to have new rings within sixty days. Respondent testified:

"Q. Did he say anything else was wrong with the tractor? A. Well, no. He said, of course,—we looked at the rolls and the tracks and we didn't expect them to last too long. Q. Any other conversation? A. Well, he *seemed to think* that it would run for 60 days without putting new rings or without doing anything to the motor. *He was under that impression.*" (Italics ours.)

On cross-examination, Mr. Lent stated that McIntosh told him 'that in sixty days he would probably have to spend three hundred fifty dollars on the motor for pistons, rings, and liners.

Mr. McIntosh stated that he told Mr. Lent that he did not think the motor was in too bad shape, that he told Mr. Lent what replacements he had made since he bought the machine, and that he stated to him:

" 'Now, the motor is not in good shape.' I says, 'You may be able to get 60 days out of it, and you may not only get 30, but the motor must eventually be overhauled; new pistons, rings, inserts.' And, of course, I didn't know any more what would be needed because I never had the hood off of it and I never went inside of the big motor. I had on the starting motor, but not the big one. So he said, 'Well, how much do you figure it will cost me to overhaul the motor?' I says, 'Your pistons, rings, and inserts, bearings, probably run you around $350.00. I don't know exactly.' 'Well,' he said, 'heck, that isn't bad. That don't amount to anything.' "

Mr. Akin stated that he knew there was diesel oil in the cooling system, and that it was quite customary to put oil in the radiator to keep it from freezing, especially during the war when they could not get Prestone.

Frank Coder stated that he was present and heard a conversation between respondent, Peterson and McIntosh. The witness stated:

"A. Oh, they were talking around there and asked what kind of shape it was in, so Mac told them that the motor needed overhauling . . . Q. You recall any more of the conversation there? A. Well, he told him that the motor needed overhauling and in fair running condition."

Charles Fanning, who was a partner of Mr. Akin, stated that the day of the sale Mr. Lent asked Mr. McIntosh about the condition of the tractor, and that he heard McIntosh say that the motor would need a general overhaul within sixty days; that McIntosh stated it might go sixty days and it might not.

We can find no testimony in the record that Mr. McIntosh ever represented to respondent that the motor was "free from defects," as found by the court in finding No. 3. Nor

do we find any testimony which would support the finding that Mr. McIntosh represented that the tractor was in "good merchantable and operating condition," as found by the trial court in finding No. 3. This was a secondhand tractor. All parties knew this. It is apparent that respondent and Mr. Peterson could and did see that the machine had had considerable use.

There is no testimony tending to show that McIntosh actually knew of the condition of the cylinder walls and the transmission case, of which respondent now complains, and respondent does not claim that appellant knew of these defects, but his argument is to the effect that appellant should have known, or that appellant is liable under the following rule:

"If a person states as true material facts susceptible of knowledge to one who relies and acts thereon to his injury, if the representations are false, it is immaterial that he did not know they were false, or that he believed them to be true." *Baxter v. Ford Motor Co.*, 179 Wash. 123, 35 P. (2d) 1090.

We shall next discuss finding No. 4. There is no testimony that Mr. McIntosh was ever asked anything about the transmission case or the "drive case," assuming that they are the same and that the court was referring to the crack found in the transmission case, until after the sale was completed, and therefore any such statement could not have been made as an inducement for respondent's entering into the written contract for the purchase of the tractor. The only testimony relative to when the crack in the transmission or drive case was discovered was that of Howard Lent, respondent's son, and Mr. Lent himself. Howard Lent stated that when they went to get the caterpillar he was cleaning off the mud and found a crack in the transmission case. Respondent was asked:

"Q. Did you know at the time you bought the thing ·the case was cracked? A. My boy found the crack in the case after we bought it, and he [McIntosh] said that was just outside. Q. Did you ask him if it was cracked at the time you bought it? A. No, because I didn't see it."

Now, as to the cracks in the cylinder walls. It is true that the cooling system had diesel oil in it instead of water at the time the machine was purchased, and while it is true that the testimony shows that it could not be determined whether or not such cracks went clear through the cylinder walls until the motor was torn down, it also appears from the testimony that the motor would work reasonably well with oil in the radiator, even with cracks in the cylinder walls, and respondent did operate the machine for a short time with the oil in the radiator. Respondent did not discover that the cracks in the cylinder walls, or the crack in the transmission case, went clear through until he tore down the motor and went into the transmission case.

While, as stated, appellant told respondent that he had repaired many parts of the machine to the extent of a thousand dollars, and had put on a new bulldozer attachment, there is no testimony to indicate that appellant knew of the condition which respondent claims he found in the cylinder walls and the transmission case, or that appellant had trouble with those particular parts.

There is no question but that respondent had trouble with the machine practically from the time he started to operate it, and the testimony shows that he expended considerable money in repairing various parts of the machine; but again we state that the testimony shows the machine bore the evidence of having had considerable use, and Peterson at least, from his experience, must have known that such machines, from the very nature of the work in which they are engaged, get a great deal of hard usage.

We are of the opinion that the evidence in this case will not support a recovery on the ground of fraud. We are of the opinion that several elements which are necessary to support such a theory are absent, and that the findings in themselves are not sufficient to support such a theory. Specifically, we are of the opinion that there is no testimony that McIntosh knew of the defects prior to the sale. There is no finding that McIntosh, in making the statements and representations testified to by respondent and Peterson, did

so with intent that respondent act thereon. In fact, there is no testimony that McIntosh ever made any specific representation relative to the cylinder walls or the transmission case prior to the sale. The only finding which could possibly cover these claimed defects is that contained in finding No. 3, to the effect that McIntosh represented the tractor to be "in a good merchantable and operating condition." It is our opinion that the weight of the undisputed testimony by both parties does not support the finding last referred to.

We are also of the opinion that the evidence does not show that the eighth element (stated in *Webster v. Romano Engineering Corp., supra*) necessary to sustain an action for fraud was present in this case, namely, that respondent had a right to rely on any representations made by appellant. After a careful examination of the record, we are satisfied that any statements made by appellant in regard to the tractor were nothing more than his opinion.

The written contract shows that appellant refused to give any warranty or guarantee. In *Getty v. Jett Ross Mines, Inc.*, 23 Wn. (2d) 45, 60, 159 P. (2d) 379, we quoted from the case of *Smith v. Bolster*, 70 Wash. 1, 125 Pac. 1022, as follows:

" 'To say that it [a secondhand automobile] was in first-class condition is nothing more than the expression of an opinion as to its then condition, or what the law sometimes terms "seller's praise." ' "

■ Assuming only for the purpose of argument that there was some testimony to support the finding that appellant represented the machine to be "in good merchantable and operating condition," it is our opinion that this statement would not constitute such a fraudulent representation as to warrant a recovery in this case. We stated in the *Getty* case, *supra*, at p. 59:

"The misrepresentations of which respondents complain are somewhat indefinite. They call attention to Mr. Field's testimony, saying that Ross represented to respondents and to Mr. Field that the dragline was *in good operable condition* and the further fact that Mr. Field concluded (taking into consideration Ross's statements that he was repairing the motor) that the machine was a fairly good machine, capable

of operating two or three months without need for major repairs. Mr. Field was an expert, amply qualified to examine and form an opinion as to the condition of the dragline." (Italics ours.)

In the cited case, the lower court was reversed. We held that the evidence preponderated against the findings. The case was remanded with instruction to enter judgment in favor of the appellant for the balance due upon the purchase price according to the terms of the contract.

We do not pretend to say that the facts in the cited case are entirely like those in the instant case, but we think the statements claimed to have been made by Mr. Ross in the cited case, as shown by the above quotation, are much like those which the court found Mr. McIntosh made in the instant case.

Also, in the instant case Mr. Peterson, at least, was not only a caterpillar operator of twenty years experience, but also a mechanic. He knew, and Mr. Lent knew, that this was a secondhand machine. They saw the oil in the radiator before the machine was purchased, and they saw a crack in the transmission case after the sale but before the caterpillar was taken away. They contend that appellant fraudulently concealed from them the condition of the cylinder walls and transmission case, yet it is apparent that, having discovered the above conditions, they did not make any further examination, regardless of the fact that appellant told them he had never gone inside the motor or into other parts of the machine, except those mentioned by him.

For the reasons herein stated, we are of the opinion that the evidence preponderates against the findings, and that it does not support the judgment on the theory of fraud. Neither can the judgment be sustained on the theory of a breach of warranty.

As hereinbefore stated, this sale was evidenced by a written conditional sale contract, executed by the parties on January 8, 1946. This contract contains, among others, the following provision:

"Purchaser agrees that he has examined the property here described and is using his own judgment as to its condition,

fitness and value, that the Seller makes no representation, statement, warranty, or guaranty as to its condition, or with reference to said property; that the execution of this contract is not procured by any statement, representation or agreement not herein contained, and that each and every condition and agreement relative to the subject matter of this contract is contained herein."

In the case of *Jones v. Mallon,* 3 Wn. (2d) 382, 101 P. (2d) 332, there was a conditional sale contract containing a provision exactly like the one above quoted from the contract in the instant case. In referring to such provision, we stated:

"The contract here in question not only stipulated that the purchasers had examined the particular property and were using their own judgment as to its condition, fitness, and value, but specifically provided that the seller made no representation, statement, warranty, or guaranty as to its condition, or with reference to the property described; and, further, that the execution of the contract had not been procured by any statement, representation, or agreement not therein contained, and that every condition and agreement relative to the subject matter was included in the agreement itself.

"The parties had the right to enter into, and bind themselves by, such an agreement.

"When a seller and a buyer deliberately enter into a contract wherein the seller positively and expressly refuses to give any warranty, *and the contract is not induced by fraud,* no warranty of any kind can be implied by law. *Webster v. Romano Engineering Corp.,* 178 Wash. 118, 34 P. (2d) 428; *Marks v. Kucich,* 181 Wash. 73, 42 P. (2d) 16." (Italics ours.)

It is apparent, we think, that, in view of the provision in the contract of sale above set out, the judgment in the instant case cannot be sustained on the theory of a breach of warranty, either express or implied.

Respondent does not seriously contend that he is not liable on the five-hundred-dollar note given as part of the original down payment on the tractor.

The judgment will be reversed in so far as it permitted respondent to recover against appellant, and will be affirmed in so far as it permitted appellant to recover judgment against respondent on the five-hundred-dollar note.

230

The cause is remanded to the trial court, with instructions to enter judgment dismissing respondent's complaint with prejudice, and awarding to appellant a judgment on his five-hundred-dollar note, as prayed for in his cross-complaint. Appellant will recover his costs herein.

MALLERY, C. J., BEALS, STEINERT, and ROBINSON, JJ., concur.